## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LILIMA NAGPAL,** | ) | |
| **KRISHEN NAGPAL,** | ) | |
|   **13100 Greenmount Ave.** | ) | |
|   **Beltsville, MD 20705,** | ) | |
| | ) | |
|       **Plaintiffs,** | ) | |
| | ) | **Civ. Action No.:** |
|     **v.** | ) | |
| | ) | |
| **PETER D. KEISLER** | ) | |
|   **Acting Attorney General** | ) | |
|   **U.S. Department of Justice** | ) | |
|   **950 Pennsylvania Ave., NW** | ) | |
|   **Washington, DC 20530** | ) | |
| | ) | |
|     **Defendant.** | ) | |
| | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

1.)　　This is an action by plaintiffs, Krishen and Lilima Nagpal, a husband and wife who have been married for over 50 years, and who are both employed by the Federal Bureau of Investigation (FBI).　Both Dr. and Mrs. Nagpal are naturalized American citizens of Indian national origin, practitioners of the Hindu religion, and over 70 years of age.　Prior to the events that gave rise to this action, both Dr. and Mrs. Nagpal engaged in protected EEO activity at the administrative level.

2.)　　The events that underlie this suit began in September of 2005, when the FBI discriminated and retaliated against Dr. Nagpal by baselessly terminating his employment as an Intelligence Analyst with the FBI's Counterterrorism Division which forced him to accept a reassignment at a reduced grade level in another Division of the FBI.

3.)     When Mrs. Nagpal sought the intervention of an EEO counselor and took action herself to prevent the agency from unlawfully terminating Dr. Nagpal, she herself became the victim of discrimination and reprisal by being baselessly accused of misconduct and subjected to an exceptionally serious internal investigation at the instigation of the FBI managers who attempted to terminate Dr. Nagpal's employment. That investigation placed Mrs. Nagpal and her long and previously-unblemished career in federal service under a cloud, and could have resulted in the termination of her career. The investigation also caused Mrs. Nagpal to lose a promotional opportunity and a performance-based Quality Step Increase in salary.

4.)     Likewise, once Dr. Nagpal's former supervisors learned that he remained employed by the agency after they terminated him from their Division, these same supervisors instigated an unfounded investigation into Dr. Nagpal and labeled him a "possible security risk."

5.)     This case seeks redress for defendant's discriminatory and retaliatory adverse employment actions toward Dr. Nagpal and Mrs. Nagpal. It arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§621, et seq.

6.)     To remedy these unlawful actions, plaintiffs seek: a.) declarations that the FBI violated the civil rights of both Dr. and Mrs. Nagpal and enjoining further discrimination and retaliation against them; b.) an order reinstating Dr. Nagpal in a position at the Grade 13 level, with commensurate backpay and benefits; c.) an order promoting Mrs. Nagpal to the position of Supervisory Human Resources Specialist at the Grade 15 level, with commensurate backpay and benefits; d.) record correction; e.) compensatory damages or, in the alternative, liquidated damages in the amount of backpay awarded to plaintiffs; and f.) an award of plaintiffs' attorneys' fees and costs.

## Parties, Jurisdiction, And Venue

7.)    Plaintiff Lilima Nagpal, who is of Indian national origin and a practitioner of the Hindu religion, has been a naturalized American citizen since 1976.  Mrs. Nagpal is the wife of her co-plaintiff, Dr. Krishen Nagpal, and is currently 76 years of age.  Mrs. Nagpal participated in protected EEO activity prior to the actions that form the basis of this Complaint.  Mrs. Nagpal is a Human Resources Specialist at FBI Headquarters in Washington, D.C., a position she has occupied since July of 1997, except for a time period between 2002 and 2004 when she temporarily served as a GS-13 Language Specialist.  At all times relevant, Mrs. Nagpal was employed by the Federal Bureau of Investigation in Washington, D.C.

8.)    Plaintiff Krishen Nagpal, who is of Indian national origin and a practitioner of the Hindu religion, has been a naturalized American citizen since 1979.  Dr. Nagpal is the husband of his co-plaintiff, Lilima Nagpal, and is currently 79 years of age.  Dr. Nagpal participated in protected EEO activity prior to the actions that form the basis of this Complaint.  From November of 2004 to September of 2005, Dr. Nagpal was employed by the FBI as a GS-13 Intelligence Analyst with the Weapons of Mass Destruction Countermeasures Unit of the Counterterrorism Division in the Headquarters office.  After being terminated from that position on or about September 19, 2005, Dr. Nagpal was forced to accept a position in the Language Services Translation and Deployment Center in the FBI Washington Field Office, where he currently works as a GS-12 Language Specialist.  At all times relevant, Dr. Nagpal was employed by the Federal Bureau of Investigation in Washington, D.C.

9.)    Defendant, Peter D. Keisler, is the Acting Attorney General of the United States, and as such is the official who heads the Department of Justice, of which the Federal Bureau of Investigation is a part and one of its principal investigative components.  The FBI employs

plaintiffs and engaged in the acts of discrimination and retaliation that are the subjects of this action. Defendant is sued in his official capacity only.

10.)    Jurisdiction of this Court is based upon 28 U.S.C. §1331, 29 U.S.C. §794a(a)(1), and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-5(c)). The rights to relief asserted by Mrs. Nagpal and Dr. Nagpal in this action arise out of the same transaction, occurrence, and series of transactions and occurrences that provide the basis for one another's claims, and questions of law or fact common to each will arise in this action. Dr. and Mrs. Nagpal seek judgment individually according to their respective rights to relief against defendant.

11.)    Venue lies in this judicial district pursuant to 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), and 28 U.S.C. §1391, because defendant's acts occurred in this judicial district, where plaintiffs were and are employed and where defendant is located.

## Statement Of The Case

### Background: The FBI's Discriminatory Treatment of Dr. Nagpal

12.)    Plaintiff Krishen Nagpal is an accomplished scientist with a PhD in Organic Chemistry. From October of 1983 until November of 2004, Dr. Nagpal worked as a Physical Scientist with the Department of the Army, during which time he authored approximately 26 scientific technical reports including reports regarding the effects of chemical warfare agents on U.S. Army weapons systems, among other topics. Dr. Nagpal also holds seven patents for inventions that he created or co-created.

13.)    In approximately 2002, Dr. Nagpal sought employment in the field of counterterrorism to assist in the federal government's "war on terrorism," and was hired by the

FBI's Language Services Translation and Deployment Center as an Urdu/Punjabi/Hindi contract Linguist on a part-time basis.

14.)    In November of 2004, Dr. Nagpal transferred from the Department of the Army to a full-time position as a GS-0132-13 Intelligence Analyst in the FBI Counterterrorism Division's Weapons of Mass Destruction Countermeasures Unit.

15.)    Very shortly after Dr. Nagpal entered on duty with the Weapons of Mass Destruction Countermeasures Unit (WMDCU), Jeffrey Muller was appointed as Unit Chief. Mr. Muller, who was not involved in Dr. Nagpal's original hire, was initially assigned as Dr. Nagpal's first-level supervisor.

16.)    In February of 2005, the role of Dr. Nagpal's first line supervisor was transferred from Mr. Muller to Supervisory Special Agent, Amy Willike. Like Mr. Muller, Ms. Willeke was not involved in hiring Dr. Nagpal.

17.)    Immediately after Ms. Willeke took over as Dr. Nagpal's supervisor, she began treating him in a hostile manner and disparately from the other Intelligence Analysts under her supervision, who were all Caucasian, significantly younger, and in fact or in appearance native born American citizens.

18.)    Ms. Willeke told Dr. Nagpal that "no one in the WMDCU knew that [he] had been hired to work in [the chemical] unit" and "no one was expecting" him there. Ms. Willeke also informed Dr. Nagpal that she had contacted one of the managers who had hired him to question that manager's reasons for doing so.

19.)    Ms. Willeke remarked to Dr. Nagpal on a number of occasions that foreigners like him "deprive" U.S. citizens "of jobs that legitimately belong to us."

20.)    Despite Dr. Nagpal's extensive experience as a scientist and chemical expert with the Army, Ms. Willeke assigned him low-level, mundane work that was not in keeping with the job duties assigned to his similarly situated colleagues.

21.)    Ms. Willeke also excluded Dr. Nagpal from attending chemical-related meetings with other government agencies, even though all of the other members of the WMDCU Chemical Team were allowed to attend them, and despite the fact that attending such meetings was a part of Dr. Nagpal's duties and responsibilities.

22.)    When Dr. Nagpal expressed to Ms. Willeke that he wanted to be included in these meetings, she responded that she preferred young employees to represent the FBI.  Ms. Willeke added that the younger employees are better able to network with their "own kind."

23.)    When Dr. Nagpal asked Ms. Willeke if he could attend a training course for Intelligence Analysts in Quantico, Virginia, Ms. Willeke denied the request, stated that she preferred to train the younger employees first, and added that older employees either receive training last or not at all.

24.)    On another occasion, Dr. Nagpal asked Ms. Willeke if he could attend an agro-terrorism training conference in Kansas City, Missouri.  Ms. Willeke reiterated her "policy" about reserving training for younger employees, and added that as a seventy year old man, Dr. Nagpal had no chance of receiving training.  She went on to question how Dr. Nagpal had achieved his grade level of GS-13 step ten, and expressed her frustration that foreigners such as he came to the United States and made more money than U.S. citizens, even though  Dr. Nagpal is a U.S. citizen.

25.)    Ms. Willeke allowed several of Dr. Nagpal's younger, U.S. born, Caucasian colleagues – who had entered on duty around the same time as him, and who were in the same

FBI probationary, career status – to attend both the agro-terrorism conference as well as another course in San Francisco for weapons of mass destruction training. Dr. Nagpal's request to attend that course was denied.

26.)     The job duties Ms. Willeke did assign to Dr. Nagpal were tedious and unsuited for an accomplished scientist of Dr. Nagpal's background, training, and experience, appointed at the GS-13 grade level.

27.)     Essentially, Ms. Willeke's assignments to Dr. Nagpal consisted of daily searching databases regarding chemical accidents across the United States, and chemical agents and plants, and preparing summaries of his findings for Mr. Muller.

28.)     Many of these databases that Dr. Nagpal was made to search contained outdated information.

29.)     Often, Mr. Muller did not even open the emails containing Dr. Nagpal's daily summaries.

30.)     Many of Dr. Nagpal's assignments were redundant as at least one other FBI office was tasked with preparing the same or highly similar daily summaries.

31.)     At one point, after Ms. Willeke learned that she would be replaced as the Chemical Team leader in WMDCU, she told Dr. Nagpal to look for another job because the male agents in the WMDCU only cared about "blondes with highlighted hair and big boobs."

### Dr. Nagpal's Initial Protected Activity

32.)     In approximately March of 2005, Dr. Nagpal contacted an EEO counselor about the disparate treatment by Ms. Willeke and Mr. Muller.

33.)     The EEO counselor contacted both Ms. Willeke and Mr. Muller about Dr. Nagpal's complaints.

34.)    Mr. Muller and Ms. Willeke responded by further isolating Dr. Nagpal in the workplace by such actions as having meetings with staff and deliberately excluding Dr. Nagpal and refusing to introduce him to senior agency officials.

## The FBI's Termination of Dr. Nagpal As An Intelligence Analyst

35.)    On September 19, 2005, shortly before the completion of his one-year FBI probationary period, Dr. Nagpal was called into a meeting with Ms. Willike, Mr. Muller, and Mary Lou Felder, the Unit Chief of the Administrative Management and Support Unit for the Counterterrorism Division.  Dr. Nagpal was handed a letter advising him that he was being terminated from his position and the FBI effective immediately, allegedly for unsatisfactory work performance.  Up to that point, Dr. Nagpal had not been advised by his supervisors that his work was anything less than satisfactory and, for the most part, he had been denied the opportunity to perform the work for which he was hired.

36.)    During the meeting, Ms. Felder demanded that Dr. Nagpal sign a letter terminating his employment.  Dr. Nagpal responded that he had serious doubts about signing the letter, and requested to speak to his wife, who is a Human Resources Specialist.

37.)    Although defendant denied Dr. Nagpal's initial request, Mr. Muller eventually allowed Dr. Nagpal to call his wife, but cautioned that he and Mrs. Nagpal had to converse in English rather than Hindi.

38.)    Dr. Nagpal reached his wife by telephone, and she advised him not to sign any documents terminating his employment until she could meet with Dr. Nagpal and review the documents.  When Mrs. Nagpal joined Dr. Nagpal, the two were again directed not to speak in Hindi.

39.)    Mrs. Nagpal made concerted efforts to prevent Ms. Willike, Ms. Felder, and Mr. Muller from terminating Dr. Nagpal's employment.  These efforts included, but were not limited to, contacting the FBI's EEO Office and attempting to secure its intervention.

40.)    In an attempt to coerce Dr. Nagpal to consent to his termination, Ms. Felder falsely informed Dr. Nagpal that he could not retire in lieu of termination by the FBI, but that he could only retire from the Department of the Army.

41.)    Finally, after further discussion with Ms. Felder, Mr. Muller instructed Dr. Nagpal to report to Ms. Felder's office to complete retirement papers.

42.)    Dr. Nagpal refused to do so until he could seek the advice of a retirement counselor, which he was not permitted to do.

43.)    When Dr. Nagpal refused to retire, his FBI credentials were ripped up, his access card was confiscated, and he was escorted out of the FBI building.

44.)    Ms. Felder directed that an SF-52 reflecting Dr. Nagpal's termination be entered into the Bureau Personnel Management System.

### Dr. Nagpal's Reassignment As A Language Specialist

45.)    During the termination meeting on September 19, 2007, at Mrs. Nagpal's urging, Peter Sursi, the Unit Chief of the Language Services Translation and Deployment Center who had supervised Dr. Nagpal when he was a contract linguist, met privately with Ms. Felder.

46.)    After doing so, Mr. Sursi advised Dr. and Mrs. Nagpal that he might be able to hire Dr. Nagpal in his section as a Language Specialist because Dr. Nagpal's language skills were critically needed by the FBI.

47.)     As a direct result of Mrs. Nagpal's efforts, on September 20, 2005, Dr. Nagpal was officially appointed to the Language Services Translation and Deployment Center as a Language Specialist and began working in that position.

48.)     Dr. Nagpal's appointment, however, was at the GS-12 grade, one full grade level below his grade as an Intelligence Analyst.

### The Agency's Discriminatory and Retaliatory Initiation of Internal Investigations Against Dr. and Mrs. Nagpal

49.)     Within days of terminating Dr. Nagpal, WMDCU management learned that he had been hired by the FBI's Language Services Translation and Deployment Center as a Language Specialist.  On or about September 29, 2005, having failed in the attempt to terminate Dr. Nagpal's employment with the FBI, Ms. Willeke and Ms. Felder transmitted an Electronic Communication to the FBI's Internal Investigation Section regarding supposed "security concerns" about Dr. Nagpal.

50.)     Dr. Nagpal is a long-time U.S. citizen, had never previously had his security clearance denied or questioned in any way, and had served with distinction as a civilian with the Department of the Army for more than 20 years.  Nonetheless, Ms. Willeke and Ms. Felder labeled Dr. Nagpal a "possible security risk" in the Electronic Communication, claimed that he had allegedly asked questions about work that was beyond the scope of his job duties, and was in possession of classified documents, some of which they admitted came from the very databases that he was tasked to search.

51.)     The WMDCU also contacted the FBI's Security Division, Internal Investigations Section, to initiate an investigation of Mrs. Nagpal by alleging that her involvement in Dr. Nagpal's transfer was improper.

52.)     In approximately April of 2006, the Internal Investigations Section notified Mrs. Nagpal that she was the subject of an internal investigation allegedly on the ground that she had improperly used her position within the FBI for the private gain/advantage of her husband.  An investigation of this nature is an exceptionally serious matter that places an FBI employee's career under a cloud while it is pending, and quite possibly for the duration of his or her career, regardless of how it is resolved.

**The Agency's Discriminatory and Retaliatory Elimination of<br>Mrs. Nagpal for Promotion to Grade 15**

53.)     Mrs. Nagpal's extensive service as a Human Resources Specialist with the Department of the Air Force, the Department of the Army, and the FBI was impeccable in every respect including, but not limited to, the matters defendant raised when it wrongfully opened its investigation of her in the FBI's Security Division, Internal Investigations Section.

54.)     Defendant's initiation of that investigation and the conduct of that investigation led to many supervisors and employees of the Administrative Services Division, where Mrs. Nagpal was assigned, to become or be made aware that she was under investigation for misconduct.  These persons included but were not limited to Maureen DeLoach, Human Resources Specialist in the Performance Recognition and Awards Unit; Brigette Class, Section Chief of the Human Resources Management Section, and Mrs. Nagpal's first-level supervisor; Susan Rosenberg, Section Chief of the Personnel Assistance Section, Personnel Management Branch; Diana DeCanio, Unit Chief of the Performance Recognition and Awards Unit; Mary Hannagan, Deputy Assistant Director of the Administrative Services Division; and Donald Packham, the Assistant Director of the Administrative Services Division.

55.)     Administrative Services Division Deputy Assistant Director (DAD) Hannagan became aware of the investigation, at the latest, on May 9, 2006.  Assistant Director (AD) Packham learned of the investigation by June 30, 2006.

56.)     On June 14, 2006, while defendant's investigation into Mrs. Nagpal was on-going, FBI Vacancy Announcement No. 03-2006-0099 for a GS-15 Supervisory Human Resources Specialist position opened for competition.  The announcement closed on or about June 27, 2006.  The selection would be made, in great part, based upon the participation of DAD Hannagan and AD Packham.

57.)     Mrs. Nagpal timely applied under the foregoing Vacancy Announcement, met or exceeded all qualifications for the position it advertised, and was more qualified for the position than the eventual selectee.

58.)     All of the applications under Vacancy Announcement 03-2006-0099 were collected and scored on or about June 28, 2006.

59.)     Following scoring, DAD Hannagan reviewed the applications and convened a panel to interview the candidates.

60.)     Despite receiving a higher score than the candidate who was ultimately selected, Mrs. Nagpal was not considered or interviewed for the position as a direct and proximate result of defendant's unlawful investigation of her identified above in paragraphs 51 through 52.

61.)     The panel forwarded three of the candidates' applications to AD Packham for review and selection, none of whom was Mrs. Nagpal.

62.)     AD Packham interviewed the three candidates and, in August of 2006, selected one of them for the position.

63.) The successful candidate was from outside of the FBI, was significantly younger than Ms. Nagpal, did not share her national origin or religion, and was manifestly less qualified than Mrs. Nagpal.

64.) Mrs. Nagpal's elimination from consideration under FBI Vacancy Announcement No. 03-2006-0099 for the position of GS-15 Supervisory Human Resources Specialist was a direct and proximate result of the internal investigation of her, which was triggered by WMDCU management for discriminatory and/or retaliatory reasons.

65.) Mrs. Nagpal's non-selection under FBI Vacancy Announcement No. 03-2006-0099 for the position of GS-15 Supervisory Human Resources Specialist position was a direct and proximate result of the internal investigation of her, which was triggered by WMDCU management for discriminatory and/or retaliatory reasons.

66.) Further, as a direct and proximate result of the internal investigation of her, which was triggered by WMDCU management for discriminatory and/or retaliatory reasons, Ms. Nagpal was denied a performance-based Quality Step Increase in salary for 2006.

67.) Additionally, Mrs. Nagpal's reputation was tainted, possibly irreparably, and she herself placed under a cloud, as a direct and proximate result of the internal investigation of her, which was triggered by WMDCU management for discriminatory and/or retaliatory reasons.

**<u>Exhaustion of Administrative Remedies</u>**

68.) On or before September 22, 2005, Dr. Nagpal timely initiated the informal EEO process with respect to his removal as an Intelligence Analyst on September 19, 2005. He timely filed a formal complaint of discrimination and retaliation on January 28, 2006. In those submissions and the ensuing investigation of his formal complaint, plaintiff timely challenged the employment actions that are the subjects of this complaint and exhausted the administrative

remedies available to him because more than 180 days have elapsed without the issuance of a Final Agency Decision.

69.)    On or before May 15, 2006, Mrs. Nagpal timely initiated the informal EEO process with respect to the FBI's internal investigation into allegations that she engaged in misconduct.  Mrs. Nagpal timely filed her formal complaint of discrimination and retaliation on June 21, 2006.  In those submissions and the ensuing investigation of her formal complaint, plaintiff timely challenged the employment actions that are the subjects of this complaint and exhausted the administrative remedies available to her because more than 180 days have elapsed without the issuance of a Final Agency Decision.

### COUNT I
### Discrimination Under Title VII (Lilima Nagpal)

70.)    Plaintiffs repeat the allegations contained in paragraphs 1 through 69 above as though fully set forth here.

71.)    Plaintiff, Lilima Nagpal, is a naturalized American citizen of Indian national origin and a practitioner of the Hindu religion.

72.)    In approximately September of 2005, the WMDCU initiated an internal investigation of Mrs. Nagpal for allegedly engaging in misconduct when she sought to prevent the agency from terminating her husband, who is also of Indian national origin and a practitioner of the Hindu religion.

73.)    Mrs. Nagpal did not engage in misconduct then or at any other time during her employment with the FBI.

74.)    The investigation placed Mrs. Nagpal's reputation and her previously-unblemished career under a cloud, and could have resulted in the termination of her career.

75.)     The investigation and the allegations of misconduct against Mrs. Nagpal became known to her supervisors and several of her co-workers, damaged her professional reputation, and caused her to lose a promotional opportunity and a Quality Step Increase, thereby subjecting her to an adverse employment action.

76.)     Defendant discriminated against Mrs. Nagpal on account of her national origin and her religion and violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-2)), by initiating the unfounded internal investigation of Mrs. Nagpal and causing the injury identified above.

77.)     Defendant's violation of Mrs. Nagpal's civil rights caused her to suffer harm to her professional reputation, emotional pain, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

**COUNT II**
**Discrimination Under Title VII (Krishen Nagpal)**

78.)     Plaintiffs repeat the allegations contained in paragraphs 1 through 77 above as though fully set forth here.

79.)     Plaintiff, Krishen Nagpal, is a naturalized American citizen of Indian national origin and a practitioner of the Hindu religion.

80.)     After Dr. Nagpal was assigned to the supervision of Mr. Muller and Ms. Willeke in the WMDCU, he was repeatedly subjected to disparaging comments that implicated his religion, ethnicity, and/or national origin.   Unlike his Caucasian, U.S. born co-workers, Dr. Nagpal was prohibited from attending meetings necessary to perform his job duties, denied training opportunities, and given menial work assignments that were significantly below his capabilities as an accomplished scientist and long-time federal employee.

15

81.)     On September 19, 2005, the WMDCU removed Dr. Nagpal from his position as a GS-13 Intelligence Analyst, allegedly for performance reasons, even though at all times during his employment in the WMDCU Dr. Nagpal's performance was at or above the fully satisfactory level.

82.)     Although Dr. Nagpal was able to secure a transfer to a position as a Language Services Specialist in lieu of termination, he was forced to take a reduction in pay grade from a GS-13 to a GS-12, which subjected him to an adverse employment action.

83.)     Defendant discriminated against Dr. Nagpal on account of his national origin, ethnicity, and/or his religion and violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-2)) by removing Dr. Nagpal from his position as a GS-13 Intelligence Analyst for pretextual reasons and causing the injury identified above.

84.)     Defendant's violation of Dr. Nagpal's civil rights caused him to suffer harm to his professional reputation, emotional pain, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

### COUNT III
### Retaliation Under Title VII (Lilima Nagpal)

85.)     Plaintiffs repeat the allegations contained in paragraphs 1 through 84 above as though fully set forth here.

86.)     Plaintiff, Lilima Nagpal, engaged in protected EEO activity when she filed a formal complaint of discrimination in October of 2002 (#F-03-5713), which was resolved through a settlement agreement in April of 2004.  She also engaged in protected activity on September 19, 2005, when she attempted to prevent the WMDCU from terminating her husband for discriminatory reasons, by, among other things, contacting the agency's Office of Civil

Rights.  All such activity was protected under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 and was reasonable and made in good faith.

87.)    After learning that Dr. Nagpal had not been terminated, the WMDCU retaliated against Mrs. Nagpal by initiating an unfounded internal investigation of her for allegedly engaging in misconduct when she sought to prevent the agency from removing her husband.

88.)    Mrs. Nagpal did not engage in misconduct then or at any other time during her employment with the FBI.

89.)    The investigation placed Mrs. Nagpal's reputation and her previously-unblemished career under a cloud, and could have resulted in the termination of her career.

90.)    The investigation and the allegations of misconduct against Mrs. Nagpal became known to her supervisors and several of her co-workers, damaged her professional reputation, and caused her to lose a promotional opportunity and a Quality Step Increase, thereby subjecting her to a materially adverse employment action that may have dissuaded a reasonable person from making or supporting a charge of discrimination.

91.)    Defendant retaliated against Mrs. Nagpal on account of her protected EEO activity and violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-2)), by initiating the unfounded internal investigation of Mrs. Nagpal and causing the injury identified above.

92.)    Defendant's violation of Mrs. Nagpal's civil rights caused her to suffer harm to her professional reputation, emotional pain, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

## COUNT IV
## Retaliation Under Title VII (Krishen Nagpal)

93.)     Plaintiffs repeat the allegations contained in paragraphs 1 through 92 above as though fully set forth here.

94.)     Plaintiff, Krishen Nagpal, engaged in protected EEO activity in approximately March of 2005 when he sought EEO counseling over the WMDCU's disparate treatment of him as compared with that afforded his Caucasian, non-Hindu, U.S. born co-workers.  As a result of Dr. Nagpal's contact with an EEO counselor, the counselor met with both of Dr. Nagpal's supervisors regarding his claims.  All such activity was protected under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 and was reasonable and made in good faith.

95.)     Subsequent to those meetings, Dr. Nagpal's supervisors continued their disparate treatment of him and further isolated him in the workplace.

96.)     On September 19, 2005, the WMDCU removed Dr. Nagpal from his position as a GS-13 Intelligence Analyst, allegedly for performance reasons, even though at all times during his employment in the WMDCU, Dr. Nagpal's performance was at or above the fully satisfactory level.

97.)     Although Dr. Nagpal was able to secure a transfer to a position as a Language Specialist in lieu of termination, he was forced to take a reduction in pay grade from a GS-13 to a GS-12, which subjected him to a materially adverse employment action that may have dissuaded a reasonable person from making or supporting a charge of discrimination.

98.)     Defendant retaliated against Dr. Nagpal on account of his protected EEO activity and violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16

(incorporating by reference 42 U.S.C. §2000e-2)), by removing Dr. Nagpal from his position as a GS-13 Intelligence Analyst for pretextual reasons and causing the injury identified above.

99.)    Defendant's violation of Dr. Nagpal's civil rights caused him to suffer harm to his professional reputation, emotional pain, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

## COUNT V
## Discrimination Under the ADEA (Krishen Nagpal)

100.)    Plaintiffs repeat the allegations contained in paragraphs 1 through 99 above as though fully set forth here.

101.)    Plaintiff, Krishen Nagpal, is 79 years of age.

102.)    After Dr. Nagpal was assigned to the supervision of Mr. Muller and Ms. Willeke in the WMDCU, he was repeatedly subjected to disparaging comments that implicated his age. Unlike his younger co-workers, Dr. Nagpal was prohibited from attending meetings necessary to perform his job duties, denied training opportunities, and given menial work assignments that were significantly below his capabilities as an accomplished scientist and long-time federal employee.

103.)    On September 19, 2005, the WMDCU removed Dr. Nagpal from his position as a GS-13 Intelligence Analyst, allegedly for performance reasons, even though at all times during his employment in the WMDCU, Dr. Nagpal's performance was at or above the fully satisfactory level.

104.)    Although Dr. Nagpal was able to secure a transfer to a position as a Language Specialist in lieu of termination, he was forced to take a reduction in pay grade from a GS-13 to a GS-12, which subjected him to an adverse employment action.

105.)    Defendant willfully and in bad faith discriminated against Dr. Nagpal on account of his age and violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621 et seq., by removing Dr. Nagpal from his position as a GS-13 Intelligence Analyst for pretextual reasons and causing the injury identified above on account of his age.

106.)    Defendant's violation of Dr. Nagpal's civil rights caused him to suffer harm to his professional reputation, emotional pain, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

**COUNT VI**
**Retaliation Under the ADEA (Lilima Nagpal)**

107.)    Plaintiffs repeat the allegations contained in paragraphs 1 through 106 above as though fully set forth here.

108.)    Plaintiff, Lilima Nagpal, engaged in protected EEO activity when she filed a formal complaint of discrimination in October of 2002 (#F-03-5713), which included claims of age discrimination.  That complaint was resolved through a settlement agreement in April of 2004.  She also engaged in protected activity on September 19, 2005, when she attempted to prevent the WMDCU from terminating her husband for age-related discriminatory reasons, by, among other things, contacting the agency's Office of Civil Rights.  All such activity was protected under the Age Discrimination and Employment Act, 29 U.S.C. §§621 et seq., and was reasonable and made in good faith.

109.)    After learning that Dr. Nagpal had not been terminated, the WMDCU retaliated against Mrs. Nagpal by initiating an internal investigation of her for allegedly engaging in misconduct when she sought to prevent the agency from removing her husband.

110.)    Mrs. Nagpal did not engage in misconduct then or at any other time during her employment with the FBI.

111.)   The investigation placed Mrs. Nagpal's reputation and her previously-unblemished career under a cloud, and could have resulted in the termination of her career.

112.)   The investigation and the allegations of misconduct against Mrs. Nagpal became known to her supervisors and several of her co-workers, damaged her professional reputation, and caused her to lose a promotional opportunity and a Quality Step Increase, thereby subjecting her to a materially adverse employment action that may have dissuaded a reasonable person from making or supporting a charge of discrimination.

113.)   Defendant willfully and in bad faith retaliated against Mrs. Nagpal on account of her prior protected activity and violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621 et seq., by initiating the unfounded internal investigation of Mrs. Nagpal and causing the injury identified above.

114.)   Defendant's violation of Mrs. Nagpal's civil rights caused her to suffer harm to her professional reputation, emotional pain, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

## COUNT VII
## Retaliation Under the ADEA (Krishen Nagpal)

115.)   Plaintiffs repeat the allegations contained in paragraphs 1 through 114 above as though fully set forth here.

116.)   Plaintiff, Krishen Nagpal, engaged in protected EEO activity in approximately March of 2005 when he sought EEO counseling over the WMDCU's disparate treatment of him compared with the treatment afforded his younger co-workers.  As a result of Dr. Nagpal's contact with an EEO counselor, the counselor met with both of Dr. Nagpal's supervisors regarding Dr. Nagpal's claims.  All such activity was protected under the Age Discrimination and Employment Act, 29 U.S.C. §§621 et seq., and was reasonable and made in good faith.

117.)    Subsequent to those meetings, Dr. Nagpal's supervisors continued their disparate treatment of him and further isolated him in the workplace.

118.)    On September 19, 2005, the WMDCU removed Dr. Nagpal from his position as a GS-13 Intelligence Analyst, allegedly for performance reasons, even though at all times during his employment in the WMDCU, Dr. Nagpal's performance was at or above the fully satisfactory level.

119.)    Although Dr. Nagpal was able to secure a transfer to a position as a Language Specialist in lieu of termination, he was forced to take a reduction in pay grade from a GS-13 to a GS-12, which subjected him to a materially adverse employment action that may have dissuaded a reasonable person from making or supporting a charge of discrimination.

120.)    Defendant willfully and in bad faith retaliated against Dr. Nagpal on account of her prior protected activity and violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621 et seq., by removing Dr. Nagpal from his position as a GS-13 Intelligence Analyst for pretextual reasons and causing the injury identified above.

121.)    Defendant's violation of Dr. Nagpal's civil rights caused him to suffer harm to his professional reputation, emotional pain, embarrassment, humiliation, mental anguish, and loss of enjoyment of life.

## **PRAYER FOR RELIEF**

Wherefore, plaintiffs Krishen and Lilima Nagpal respectfully request that the Court enter judgment in their favor and award them the following relief:

A.    An Order declaring that defendant violated both Dr. and Mrs. Nagpal's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621 et seq., and enjoining further

discrimination and retaliation against them.

B.      An order reinstating Dr. Nagpal in a position at the Grade 13 level, with commensurate backpay and benefits; and an order promoting Mrs. Nagpal to the position of Supervisory Human Resources Specialist at the Grade 15 level, with commensurate backpay and benefits;

C.      Record correction to remove all documents reflecting the agency's attempt to terminate Dr. Nagpal and the internal investigations initiated against him and Mrs. Nagpal;

D.      Compensatory damages in an amount to be determined at trial to compensate plaintiffs for the physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of future career opportunities, loss of professional reputation, and loss of enjoyment of life caused by the agency's actions; or, in the alternative, liquidated damages in the amount of backpay awarded to plaintiffs;

E.      Pre- and post-judgment interest;

F.      The attorneys' fees and costs incurred by plaintiffs; and

G.      Such other relief as may be just and appropriate.

**<u>Jury Demand</u>**

Plaintiffs request a trial by jury of all issues so triable.


Respectfully submitted,


/s/
_____
Robert C. Seldon, Esq.
  D.C. Bar No. 245100


/s/
_____
Molly E. Buie, Esq.
  D.C. Bar No. 483767

Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 305
Washington, D.C.  20004
Telephone: (202) 955-6968

Counsel for Plaintiffs

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Lilima Nagpal<br>Krishen Nagpal | Peter D. Keisler, Acting Attorney General<br>U.S. Department of Justice |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     888888<br>(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT       <br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Robert C. Seldon, Esq.<br>Molly E. Buie, Esq.<br>Robert C. Seldon & Associates, P.C.<br>1319 F Street, NW, Suite 305<br>Washington, DC 20004

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
   Plaintiff

○ 3 Federal Question
   (U.S. Government Not a Party)

⊙ 2 U.S. Government
   Defendant

○ 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place<br>of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a<br>Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/<br>Malpractice | ○ C. Administrative Agency<br>Review | ○ D. Temporary Restraining<br>Order/Preliminary<br>Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>Social Security:<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>Other Statutes<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If<br>    Administrative Agency is Involved) | Any nature of suit from any category may<br>be selected for this category of case<br>assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil | |
|---|---|---|---|
| Real Property<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>Personal Property<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | Bankruptcy<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>Prisoner Petitions<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>Property Rights<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>Federal Tax Suits<br>☐ 870 Taxes (US plaintiff or<br>    defendant<br>☐ 871 IRS-Third Party 26<br>    USC 7609 | Forfeiture/Penalty<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure<br>    of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational<br>    Safety/Health<br>☐ 690 Other<br><br>Other Statutes<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC<br>    Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced &<br>    Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>    Exchange<br>☐ 875 Customer Challenge 12 USC<br>    3410<br>☐ 900 Appeal of fee determination<br>    under equal access to Justice<br>☐ 950 Constitutionality of State<br>    Statutes<br>☐ 890 Other Statutory Actions (if<br>    not administrative agency<br>    review or Privacy Act |

| ☉ G. *Habeas Corpus/ 2255* | ◉ H. *Employment Discrimination* | ☉ I. *FOIA/PRIVACY ACT* | ☉ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ☉ K. *Labor/ERISA (non-employment)* | ☉ L. *Other Civil Rights (non-employment)* | ☉ M. *Contract* | ☉ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

## V. ORIGIN

☉ 1 Original Proceeding ☉ 2 Removed from State Court ☉ 3 Remanded from Appellate Court ☉ 4 Reinstated or Reopened ☉ 5 Transferred from another district (specify) ☉ 6 Multi district Litigation ☉ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Defendant's violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e-16, and the Age Discrimination and Employment Act, 29 U.S.C. §§621, et. seq.

| VII. REQUESTED IN COMPLAINT | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ $300,000 per Plaintiff<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☒   NO ☐ |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form. |
|---|---|---|---|

DATE    November 8, 2007    SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.