# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LILIMA NAGPAL, ) | Civil Action No. 07-02032 (JDS) |
| KRISHEN NAGPAL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ERIC H. HOLDER, ) | MEMORANDUM OPINION |
| Attorney General, ) | GRANTING DEFENDANT'S |
| U.S. Department of Justice, ) | MOTIONS FOR SUMMARY |
| ) | JUDGMENT |
| Defendant. ) | |
| _____) | |

## Introduction

Presently before the Court are the Federal Bureau of Investigation's (Defendant) Motions for Summary Judgment as to Plaintiffs Lilima Nagpal (Mrs. Nagpal) [Doc. No. 23] and Dr. Krishen Nagpal (Dr. Nagpal) [Doc. No. 25]. Plaintiffs are naturalized citizens of Indian national origin, practitioners of the Hindu religion, and over 70 years of age. Plaintiffs' claims arise under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-16, and the Age Discrimination in Employment Act, as amended, 29 U.S.C. Section 621 et. seq. (ADEA). Specifically, Dr. Nagpal alleges discrimination on the basis of age, religion, and

national origin. Further, Dr. Nagpal alleges retaliation for engaging in protected EEO activity. Dr. Nagpal points to certain statements made by his supervisors which, he argues, denote discrimination. Dr. Nagpal also argues that the statements demonstrate the pre-textual nature of the proffered non-discriminatory reasons for his termination.

Similarly, Mrs. Nagpal alleges discrimination based upon her national origin and religion. Mrs. Nagpal alleges that the FBI retaliated against her for complaining that her husband had been terminated for discriminatory reasons.

The parties were joined permissibly in a single action. The Defendant filed separate motions and briefs with respect to each Plaintiff. Plaintiffs responded with a single brief. Because the nexus of facts and legal standards for both Plaintiffs are essentially the same, the Court shall address both motions in this Memorandum Opinion and Order.

## Factual Summary

### Dr. Nagpal

Dr. Nagpal is a scientist with a PhD in organic chemistry. Defendant's Statement of Undisputed Material Facts, Doc. No. 25-2 ¶ 20. Dr. Nagpal moved to the United States from India in 1970 and spent much of his career working for the United States Army as a physical scientist. *Id.* at 23, 24. From 2002 to 2003, Dr.

Nagpal worked for the FBI as a part-time contract translator. *Id.* at 31. While working as a contract translator, Dr. Nagpal's supervisor Peter Sursi (Mr. Sursi) found him to be a slow but competent translator. *Id.* at 32, 33. On November 29, 2004, Dr. Nagpal was hired as a GS-13 FBI Intelligence Analyst in the agency's Weapons of Mass Destruction Counterterrorism Unit (WMDCU), subject to a one year probationary period. *Id.* at 45. In late 2004 or early 2005, Mr. Muller became unit chief of the WMDCU. *Id.* at 56. In February 2005, Supervisory Special Agent Amy Willeke (SSA Willeke) became Dr. Nagpal's first-line supervisor. *Id.* at 62. SSA Willeke perceived and documented many deficiencies with Dr. Nagpal's work, including taking an inordinate amount of time to complete assignments and preparing inadequate intelligence reports. *See Id.* at 83-143.

In May of 2005, Dr. Nagpal met with an Equal Employment Opportunity (EEO) Counselor and complained that he was not being included in certain meetings, training and other work. *Id.* at 144, 145. Some time after May 13, 2005, the EEO Counselor met with SSA Willeke to discuss Dr. Nagpal's concerns.

At a meeting on September 19, 2005 with Ms. Felder, the Unit Chief for the CTD Administrative Management Support Unit, Mr. Muller, and SSA Willeke, Dr. Nagpal was presented with a letter terminating his employment. *Id.* at 148. Dr. Nagpal telephoned Mrs. Nagpal who instructed him not to sign the letter. Doc. No.

33-4 ¶ 4. When she arrived at the meeting, Mrs. Nagpal was reprimanded by Ms. Felder for speaking to Dr. Nagpal in Hindi. At that point, Mrs. Nagpal made several telephone calls to FBI officials, including the head of the EEO office, to complain of Dr. Nagpal's discriminatory removal. *Id.* at 6. Mrs. Nagpal then contacted Mr. Sursi, Dr. Napal's former supervisor, showed him the removal letter, and asked if there was anything that he could do. *Id.* at 7. At that point, Mr. Sursi met privately with Ms. Felder and Ms. Willeke. *Id.* At that meeting they contacted the Section Chief of Language Services to determine if permanent full time positions were available for Dr. Nagpal. *Id.* at 8. The Section Chief expressed concern that the agency had an interest in keeping competent Urdu speakers with a top secret security clearance. *Id.* at 9. Dr. Nagpal was told he could come to work in the Language Services Division and was transferred to a position as a GS-12 Language Analyst, one grade level below his position as an intelligence analyst. *Id.* at 12. The Language Analyst position was not posted and Dr. Nagpal did not apply for the position. Doc. No. 23-2 ¶¶ 64, 65.

After Dr. Nagpal's termination and rehire, Ms. Felder entered his termination into the FBI computer system but that information was removed. *Id.* at 72. The termination was entered a second time and was again removed without Ms. Felder's input or knowledge. *Id.* at 73. Later it was discovered that Bridget Class had

administratively input Dr. Nagpal into the system as having been transferred to the Language Services Unit. *Id.* at 74.

On October 6, 2005, Dr. Nagpal complained to an EEO counselor that his termination was based on his age and national origin. Doc No. 25-2 ¶150. On January 28, 2006, Dr. Nagpal filed an EEO Complaint in which he alleged discrimination based on age, national origin and retaliation. SSA Willeke had raised previous security concerns regarding Dr. Napal which resulted in an investigation of him. *See Id.* at 154-160. The investigation was later closed and ultimately did not affect Dr. Nagpal's security clearance. *Id.*

**Mrs. Nagpal**

Mrs. Nagpal practices the Hindu religion and was born in 1931. Doc. 23-2 ¶ 1. She worked in human resources for the United States Army, Navy and Air Force from 1977-1997. *Id.* at 2. In 1997, she was hired by the FBI as a GS-13 classification specialist. *Id.* at 3. The FBI changed Mrs. Nagpal's job title to human resource specialist in 2000 or 2001. *Id.* at 5. From 1999-2005, the FBI employed a two tier evaluation system classifying each employee as having met or not having met expectations during the evaluation period. *Id.* at 11. Each year Mrs. Nagpal met expectations during the tenure of that system. *Id.* at 12. Mrs. Nagpal was promoted to a GS-14 in 2004. *Id.* at 26. In 2006, the FBI implemented a five tier evaluation

system under which employees were rated as unacceptable, minimally successful, successful, excellent and outstanding. *Id.* at 13. Mrs. Nagpal's immediate supervisor, Ms. Foskey, initially rated Mrs. Nagpal and her colleagues outstanding but later changed all the ratings to excellent. *Id.* at 18-23. Mrs. Nagpal continued to earn "excellent" ratings and performed well as a GS-14 human resource specialist. *Id.* at 24, 25. Beginning in 2005, Mrs. Nagpal applied for, but did not obtain, at least three GS-15 positions in the FBI. *Id.* at 27, 29, 38.

On September 21, 2005, SSA Willeke finalized an electronic communication (EC) with the Security Division, which expressed security concerns involving Dr. Nagpal, and also concerned Mrs. Napal and others who took part in the intervention in Dr. Napal's termination and subsequent transfer to the Language Services Division. Doc. 33-4 ¶14. On October 6, 2005, Mrs. Nagpal sought EEO counseling and filed an informal complaint of discrimination against Ms. Felder, SSA Willeke, and Mr. Muller. *Id.* at 13. Thereafter, the FBI's Office of Professional Responsibility (OPR) initiated an investigation into whether Mrs. Nagpal misused her position for the benefit or advantage of her husband. *Id.* at 15. Mrs. Nagpal learned of the investigation on April 18, 2006. *Id.* Mrs. Nagpal and other targets of the investigation complained of increased stress and anxiety as a result of the investigation. *Id.* at 16. Mrs. Nagpal's supervisors and co-workers learned about the

charges against her. *Id.* at 17. An OPR investigation triggers a flag placed in the FBI's Critical Case Tracking System. *Id.* at 22. Once an employee is flagged, the Administrative Services Division is required to check with the OPR prior to proceeding with any personnel action, including promotions. *Id.*

Mrs. Nagpal alleges two materially adverse employment actions resulted from the investigation. First, she argues that she was excluded from interviews and was passed over for a promotion. Second, she was downgraded from and "outstanding " rating to "excellent."

### Standard of Review

Summary judgment, "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ P. 56(c); *see also* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C.Cir.2006). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Id.* at 895 quoting <u>Anderson</u>, at 248. An issue is "genuine" if the evidence could provide for a reasonable jury returning a verdict for the nonmoving party. *See Id.* When considering a motion for

summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. On a motion for summary judgment the Court should, "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C.Cir.2007).

However, a party opposing summary judgment must set forth more than mere unsupported allegations or denials and the opposition must be supported by affidavits, declarations or other competent evidence, demonstrating specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the opposing party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson at 249-50; *see also* Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.' ") *(quoting* Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). To successfully defend a motion for summary judgment, a party must have more than "a scintilla of evidence to support his claims." Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 845 (D.C.Cir.2001).

**Discussion**

**I.      Dr. Nagpal**

**A.      Exhaustion of Administrative Remedies**

At the outset,  Defendant argues that the Court ought to dismiss Dr. Nagpal's claim of religious discrimination because he failed to exhaust his administrative remedies . Specifically, Defendant states that while Dr. Napal alleged national origin, age and retaliation at the administrative stage in his EEO complaint, he failed to allege religious discrimination and certain other aspects of his claim.   Defendant argues that this omission forecloses Dr. Nagpal's present assertion of discrimination based on his religion.

Title VII requires that a plaintiff exhaust administrative remedies prior to bringing a civil action in federal court.  Park v. Howard University, 71 F.3d 904, 907 (D.C.Cir.1995). To exhaust administrative remedies, a plaintiff must file a claim with the agency and "allow the agency time to act on the charge." *Id.*  A lawsuit in federal court is "limited in scope to claims that are 'like or reasonably related to the allegations' " in the administrative charge. *Id.* (quoting Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir.1994)). The claims "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.' " *Id.* (*quoting* Chisholm v. U.S. Postal Service, 665 F.2d 482, 491

-9-

(4th Cir.1981)).

Dr. Nagpal argues that Defendant was constructively put on notice of his religious discrimination claim by virtue of his other claims based on national origin and age. Defendant counters that filing one discrimination claim does not put the agency on notice of another. Defendant points out that in the seven page single spaced narrative attached to his EEO complaint, Dr. Nagpal never mentioned religion.

The Court agrees with Defendant that Plaintiff has failed to exhaust administrative remedies in terms of religious discrimination. Therefore, that claim, with respect to Dr. Nagpal, shall be dismissed.

## B.    ADEA and Title VII Claims

When a plaintiff lacks direct evidence of discrimination the Supreme Court has established a burden-shifting approach that applies to discrimination in employment. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The D.C. Circuit applies the same rationale to Title VII cases and ADEA cases. See, e.g., Baloch v. Kempthorne, 550 F.3d 1191, 1196-97 (D.C. Cir. 2008).

Traditionally, to demonstrate a *prima facie* case for discrimination a plaintiff must have shown that , "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

-10-

of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C.Cir.2002)(citation omitted). Once those criteria were established, the burden shifted to the employer to, "articulate some legitimate, nondiscriminatory reason" for its action. Paquin v. Fannie Mae, 119 F.3d 23, 26, (D.C.Cir. 1997). Finally, a plaintiff must have proven by a preponderance of the evidence that the reasons proffered by the employer were a pretext for discrimination or retaliation. *See* McDonnell Douglas 411 U.S. 792, 804 (1973).

Presently, the D.C. Circuit has made clear that where the employer has asserted a legitimate, nondiscriminatory reason for the decision at issue, "the district court need not - and should not - decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, according to Brady, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee...?" Id.

In this case, Dr. Nagpal alleged that he suffered an adverse employment action and Defendant has asserted a legitimate non-discriminatory reason for his termination. Accordingly, the Court's analysis rests with the final prong of the

McDonnell Douglas framework. In other words, the Court must consider whether Dr. Nagpal provided sufficient evidence for a reasonable jury to find that the Defendant's stated non-discriminatory reasons, namely his work performance, is a pretext. See Brady, 520 F.3d 490 at 494.

Defendant argues that summary judgment is appropriate because Dr. Nagpal cannot establish that the reason for his termination was his age or national origin. Defendant asserts that Dr. Nagpal's primary rebuttal to its proffered reasons for his termination are his subjective assessments of his own performance. Defendant suggests that Dr. Nagpal's opinions of his performance cannot, in and of themselves, establish pretext sufficient to defeat summary judgment.

Predictably, Dr. Nagpal's interpretation of his performance differs significantly. Dr. Nagpal argues that the reasons for his termination are a pretext to discrimination. In support of this inference, Dr. Nagpal states that SSA Willeke introduced herself to him by asking if he was "one of those Hindi guys," and told him that she used to be a border patrol agent and had dealt with people like him before. See Plaintiff's Statement of Genuine Issues Doc. No. 33-3 ¶ 4. Further, Dr. Nagpal states that SSA Willike remarked to him that foreigners like him deprive U.S. citizens "jobs that legitimately belong[] to us." Id. at ¶ 5. Dr. Nagpal alleges that when he expressed an interest in certain meetings, SSA Willeke responded that she preferred

young employees to represent the FBI. Further, Dr. Nagpal alleges SSA Willeke said that the younger employees are better able to network with their "own kind." Complaint ¶ 22. Dr. Nagpal alleges that when he asked about certain training opportunities SSA Willeke said she prefers to train the younger employees first and older employees are trained last or not at all. Id. at 23. Dr. Nagpal alleges that SSA Willeke stated that as a seventy-year-old man, he had no chance of receiving training. Id. at 24. SSA Willike also allegedly expressed frustration about how foreigners came the United States and made more money than citizens. Id.

In turn, Defendant denies most of the statements, dismisses others as nonsensical stray remarks and counters that Dr. Nagpal cannot directly dispute his documented poor performance. Defendant argues that the alleged statements have no nexus to the adverse employment decision. Defendant also points to other supervisors who had concerns about Dr. Napal's work performance as an Intelligence Analyst with the WMDCU.

At this stage, since Defendant has provided a legitimate non-discriminatory reason for his termination, Dr. Nagpal's burden is to demonstrate that the reason for his termination was a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. When examining allegations of pre-text it is well established in the D.C. Circuit that courts should not, "second-guess an employer's personnel

decision absent demonstrably discriminatory motive." <u>Milton v. Weinberger</u>, 696 F.2d 94, 100 (D.C.Cir.1982). Rather, once an employer offers a non-discriminatory reason for its decision the ultimate issue is whether," the employer honestly believes in the reasons it offers." <u>Fischbach v. D.C. Dep't of Corr.</u>, 86 F.3d 1180, 1183 (D.C.Cir.1996) (quoting citation omitted).

Considering Dr. Napal's allegations of disparate treatment together with the alleged discriminatory remarks, the Court finds Dr. Nagpal has not presented evidence sufficient to rebut Defendant's proffered legitimate reasons for his termination. Specifically, the Court agrees with Defendant that Dr. Nagpal's subjective views of his performance do not adequately rebut the inference that his supervisors honestly believed that his performance was deficient. In terms of SSA Willike's documented deficiencies, Dr. Nagpal's rebuttal is based largely on his perception of his performance[1]. However, a plaintiff "cannot establish pretext simply based on [his] own subjective assessment of [his] own performance, for 'plaintiff's perception of himself, and of his work performance, is not relevant. It is the

---

[1] Dr. Nagpal also asserts that he was denied training and advice on what his job duties encompassed which explain the deficiencies. However, the record reflects that Dr. Nagpal was provided training and materials. Doc. No. 25-2 ¶ 67-73. Further, Defendant adequately supplied evidence that Dr. Nagpal was ineligible for certain training by virtue of his seniority and position rather than for discriminatory reasons. The Court notes that Dr. Nagpal billed himself as a "one stop intelligence" analyst for the GS-13 position rather than an entry level employee requiring training. Consequently, the Court finds Dr. Nagpal's complaints concerning denied training opportunities unavailing. Id. at ¶ 37.

perception of the decision[]maker which is relevant.'" Waterhouse v. District of Columbia, 124 F.Supp.2d 1, 7 (D.D.C.2000) (abrogated on other grounds by Mastro v. Potomac Electric Power Co., 447 F.3d 843, 851 (D.C.Cir.2006) (quoting Smith v. Chamber of Commerce of the United States, 645 F.Supp. 604, 608 (D.D.C.1986)).

Defendant provides convincing evidence that Dr. Nagpal's other supervisors shared concerns about his performance as an intelligence analyst. In addition to the performance deficiencies noted by SSA Willike, Defendant presents evidence that other supervisors had similar concerns. Specifically, Dr. Nagpal's former supervisor, Peter Sursi, did not recommend him for the GS-13 position and opined that he would be a disaster as an intelligence analyst, citing deficiencies in pace and computer literacy. Doc. No. 25-2 ¶ 32-35. Mr. Krueger, Dr. Nagpal's first-line supervisor in 2004, had concerns that Dr. Nagpal was not well suited to the WMDCU. Doc. 25-2 ¶ 50. After giving Dr. Nagpal a Chemical Industry Handbook to review, it appeared to the Unit Chief, Brit Johnson, that Dr. Nagpal lacked an understanding of the WMDCU's mission. Id. ¶¶ 51-55. Prior to his departure as Unit Chief, Brit Johnson briefed the incoming Unit Chief that Dr. Nagpal, "was having difficulties with the pace of the unit and struggling with many of the elementary requirements of the job." Id. at 58.

Furthermore, the record reflects that Dr. Nagpal's termination was not finalized

by SSA Willeke alone. Indeed, Mr. Muller and Ms. Felder were also present. Dr. Nagpal has offered no compelling evidence of discriminatory animus attributable other supervisors which were critical of his work performance. In view of the evidence supplied by Defendant supporting its non-discriminatory reasons for Dr. Nagpal's termination, the Court finds that no reasonable jury could find pretext and Defendant's motion for summary judgment on Dr. Nagpal's claims of discrimination is granted.

## C. Retaliation Claims

Defendant argues that Dr. Nagpal's retaliation claims fail because there is no causal connection between his protected activity and his termination. Specifically, Defendant reasons that the allegations of retaliatory action lack "temporal proximity" to his termination to establish causation. Defendant cites cases which suggest that three months is the outer limit for the temporal proximity requirement. *See* Baker v. Potter, 294 F.Supp.2d 33, 40 (D.D.C.,2003) (finding that two month gap between protected activity and adverse employment action insufficient to demonstrate temporal proximity to establish a causal connection). Dr. Nagpal's termination occurred four months subsequent to his protected activity.

The federal government is prohibited from retaliating against an employee for engaging in action protected by Title VII. 42 U.S.C. § 2000e-3(a); Steele v. Schafer,

535 F.3d 689, 695 (D.C.Cir.2008). A plaintiff must show that a causal connection existed between the protected activity and the adverse personnel action. *See* McKenna v. Weinberger, 729 F.2d 783, 790 (D.C.Cir.1984). A causal connection, " may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse ... action took place *shortly* after that activity." (Emphasis supplied) Mitchell v. Baldrige, 759 F.2d 80, 86 ( D.C. Cir1985).

In examining temporal proximity, the Supreme Court determined that, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,' O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (C.A.10 2001). See, e.g., Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-1175 (C.A.7 1992)( 4-month period insufficient)." Clark County School Dist. v. Breeden, 532 U.S. 268, 273-274 (2001).

Even assuming the period of time was smaller, Defendant provides evidence that SSA Willeke had begun the process to terminate Dr. Nagpal prior to her

knowledge of him engaging in any protected activity. *See* Doc. No. 42, p.19[2]. Absent other compelling evidence of causation, the Court must conclude that in the D.C. Circuit the four month gap between protected activity and the adverse employment action lacks the temporal proximity necessary to establish a causal connection. Consequently, Defendant is entitled to summary judgment on Dr. Nagpal's retaliation claim as a matter of law.

## II. Mrs. Nagpal

### A. Discrimination Claims

Defendant argues that summary judgment is appropriate for Mrs. Nagpal's discrimination claims. Specifically, Defendant reasons that there is no issue of material fact concerning her disparate treatment claims because the FBI did not investigate her on the basis of her national origin or religion. In addition, Defendant argues that the FBI did not subject her to an "adverse employment action" in conducting the investigation.

Mrs. Nagpal counters that SSA Willeke's disparaging comments concerning national origin and religion to Dr. Nagpal ought to extend to her in terms of

---

[2] On April 29, 2005 SSA Willeke emailed Ms. Felder and Ms. Deloach concerning Dr. Nagpal indicating that his performance may warrant removal. Doc. No. 33-7 pp. 2,3. In that email, SSA Willeke specifically asks if any of the noted deficiencies could be used to terminate his employment. Dr. Nagpal's protected activity (contacting an EEO Counselor) did not occur until May of 2005.

-18-

demonstrating discriminatory animus.

Under Title VII, "the two essential elements of a [disparate treatment] claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's" national origin or religion. Baloch v.Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

The Court finds that SSA Willeke's comments taken alone, as they relate to Mrs. Nagpal, are insufficient to create the inference that the OPR investigation was undertaken on the basis of religion or national origin discrimination. This finding is buttressed by the fact that Bridget Class, who is neither Hindi nor from India, was a subject of the investigation as well. The record reflects that while she may have played a role, SSA Willeke was not ultimately responsible for initiating the investigation. Indeed, it was Mr. Harrington, the Deputy Assistant Director to the Counter Terrorism Division, who referred Mrs. Nagpal for the investigation due to his concerns over Dr. Nagpal's termination and immediate reinstatement. Harrington Dep. P. 31. There is no evidence before the Court that Mr. Harrington displayed discriminatory animus towards Hindus or persons from India. Additionally, it is undisputed that a referral to the Initial Processing Unit does not necessarily result in an investigation. Doc. 33-2 ¶ 5. Defendant presented evidence from other officials that document the reasonable possibility of misconduct which emanated from the

unorthodox termination and rehire of Dr. Nagpal. Doc. 23-2 at ¶¶ 77, 78, 87.

In sum, the Court agrees with Defendant that there is insufficient evidence to create a genuine issue of material fact with which a jury could find the investigation was undertaken on the basis of Mrs. Nagpal's national origin or religion. Therefore, the Court grants summary judgment to Defendant on Mrs. Nagpal's Claims of discrimination based on religion and national origin.

**B.    Retaliation Claims**

Defendant argues that Mrs. Nagpal's retaliation claims fail because the FBI did not investigate her on the basis of engaging in protected activity. Defendant further argues that mere referral to the Inspection Division did not result in an adverse personnel action.

Mrs. Nagpal insists that she was referred to the inspection division for participating in protected EEO activities. In support, Mrs. Nagpal points out that Mr. Harrington forwarded the EC dated September 29, 2005 only after the Nagpals engaged in protected activity. Mrs. Nagpal asserts that, contemporaneously with Dr. Nagpal's termination, both Dr. and Mrs. Nagpal alleged discrimination and she called the EEO office. Moreover, Mrs. Nagpal argues that the timing of the referral to the Inspection Division demonstrates retaliatory animus. Specifically, Mrs. Nagpal states that Mr. Harrington held onto the September 29, 2005 EC for a period of three

months and forwarded it only after an unsuccessful mediation concerning their informal EEO complaints. Doc. No. 33 p. 42.

The parties do not dispute that Mrs. Nagpal engaged in protected activity. When considering an "adverse employment action," the Supreme Court determined that the, "language of the substantive [anti-discrimination] provision differs from that of the anti-retaliation provision in important ways ... Title VII's substantive provision and its anti-retaliation provision are not coterminous ... " Steele v. Schafer, 535 F.3d 689, 695 (D.C. Cir. 2008) (quoting Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 61, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). In terms of the standard for finding a materially adverse employment action, the Supreme Court adopted the following, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68 (internal quotation marks omitted).

Mrs. Nagpal's colleagues learned of the investigation. While a referral to the Inspection Division does not necessarily trigger an investigation, an investigation results in an employee being flagged in the FBI's Critical Case Tracking System. This requires the Administrative Services Division to check with the OPR prior to

proceeding with a personnel action.

The Court concludes that, when applying the <u>Burlington Northern</u> standard, referral to the Inspection Division alone, and the potential consequences thereof, could indeed dissuade a reasonable worker from complaining of discriminatory activity.

The remaining question is whether, in view of the reasons offered by Defendant, a reasonable jury could infer from evidence supplied by Mrs. Nagpal that the referral to the investigatory unit was a response to her engaging in protected activity rather than a result of the legitimate, non-retaliatory non-discriminatory reasons. See <u>Patterson v. Johnson</u>, 505 F.3d 1296, 1299 (D.C. Cir. 2007) (citation omitted).

To rebut Defendant's proffered reasons for the referral, Mrs. Nagpal advances two theories which she argues infer retaliation. First, she argues that the timing of the agency's actions demonstrates a retaliatory animus. Second, that the Defendant's stated reasons are false.

In terms of timing, Defendant counters that Mr. Harrington was not aware of any EEO activity by Dr. or Mrs. Nagpal until after he forwarded the EC to the inspection division. *See* Harrington Affidavit p. 5, Doc. No. 41-1. Thus, his referral could not have been retaliatory. Further, Defendant points out that there is no

allegation that Mr. Harrington discriminated against either plaintiff. Therefore, Defendant reasons, he would have no motive to retaliate against Mrs. Nagpal. Finally, Defendant explains that it took time to have the EC reviewed and approved by the entire chain of command. Accordingly, Defendant submits that the fact that Mr. Harrington waited to forward the EC does not support an inference of retaliation.

The Court agrees, and the record supports, that Mr. Harrington's handling of the EC, right or wrong, still could not support the inference of retaliation based on the absence of any evidence suggesting retaliatory or discriminatory animus on his part.

The Court finds Mrs. Nagpal's attempt to demonstrate pretext by showing the Defendant's reasons for its action against her were false is also unavailing. As discussed *supra*, under the circumstances there was a reasonable basis for members of the WMDCU to believe the matter should be referred to the investigatory unit.

For the reasons discussed above with respect to her discrimination claims Mrs. Nagpal's retaliation claims also fail. Indeed, Defendant presented compelling evidence that supervisors may well have been remiss had the unusual circumstances surrounding the contemporaneous termination and rehire of Dr. Nagpal not been referred to the investigatory unit[3]. The Initial Processing Unit of the investigatory

---

[3] The FBI requires employees to report possible misconduct to the agencies inspection division. Doc. 23-2 ¶ 80.

division, to which no retaliatory or discriminatory animus is attributed, found that the circumstances surrounding Dr. Nagpal's termination and rehire presented a "substantive possibility of misconduct" sufficient to warrant an investigation. Doc. 23-2 ¶ 86. Essentially, Dr. Nagpal was hired for a position in the FBI which he neither applied for nor was posted. In addition, Dr. Nagpal's termination was repeatedly removed from the FBI computer system by Ms. Class. Doc. No. 23-2 at ¶ 74.

The inclusion of another employee (Ms. Class) in the investigation, who did not engage in protected activity, further supports Defendant's legitimate non-retaliatory reason for the referral. Mrs. Nagpal did not submit any direct evidence that her complaint of Dr. Nagpal's termination as discriminatory was the reason for her referral to the investigatory unit. Therefore, based on the evidence of record, the Court finds that no reasonable jury could conclude that the referral of Mrs. Nagpal to the investigatory division was made on the basis of her engaging in protected activity.

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 25] is **GRANTED** and Defendant's Motion for Summary Judgment [Doc. No. 23] is **GRANTED**.

**DONE** and **DATED** this 4th day of November, 2010.


/s/ Jack D. Shanstrom

_____

Jack D. Shanstrom
Senior United States District Judge